Simply observing the condition of the vehicles while on the lot was not a "search"[83] and recording the VINs was not a "seizure."[84]

Because Meints did not in fact have a reasonable expectation of privacy in his urban lot, the land was an open field. Therefore, McCormick did not need a warrant because his information gathering was not a "search" under the Fourth Amendment.

## CONCLUSION

There is no "probable cause exception" to the warrant requirement. The Court of Appeals erred by assuming that a search occurred and excusing the lack of a warrant because the officer who intruded on the land had probable cause. But, under the open fields doctrine, there was no "search." So, police did not need a warrant to gather information on the property, and we affirm on that ground.

AFFIRMED.

HEAVICAN, C.J., not participating.

---

[83] See *United States v. Dunn, supra* note 70, 480 U.S. at 305.

[84] See *Arizona v. Hicks*, 480 U.S. 321, 324, 107 S. Ct. 1149, 94 L. Ed. 2d 347 (1987). Accord *New York v. Class*, 475 U.S. 106, 106 S. Ct. 960, 89 L. Ed. 2d 81 (1986).

---

STATE OF NEBRASKA, APPELLEE, V.
CARLOS R. HERRERA, APPELLANT.
___ N.W.2d ___

Filed December 5, 2014.     No. S-13-659.

1. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.
2. **Expert Witnesses: Appeal and Error.** The standard for reviewing the admissibility of expert testimony is abuse of discretion.
3. **Trial: Expert Witnesses: Appeal and Error.** An appellate court reviews the record de novo to determine whether a trial court has abdicated its gatekeeping function when admitting expert testimony.

4. **Trial: Expert Witnesses.** Under the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion.

5. **Trial: Expert Witnesses: Intent.** The purpose of the gatekeeping function is to ensure that the courtroom door remains closed to "junk science" that might unduly influence the jury, while admitting reliable expert testimony that will assist the trier of fact.

6. ____: ____: ____. The intent of the test under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), was to relax the traditional barriers to expert testimony by permitting courts to receive expert testimony based on "good science" even before that science became generally accepted.

7. **Pretrial Procedure: Expert Witnesses.** A challenge to the admissibility of evidence under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), should take the form of a concise pretrial motion. It should identify, in terms of the *Daubert/Schafersman* factors, what is believed to be lacking with respect to the validity and reliability of the evidence and any challenge to the relevance of the evidence to the issues of the case. In order to preserve judicial economy and resources, the motion should include or incorporate all other bases for challenging the admissibility, including any challenge to the qualifications of the expert.

8. **Trial: Expert Witnesses.** Before admitting expert opinion testimony, the trial court must determine whether the expert's knowledge, skill, experience, training, and education qualify the witness as an expert.

9. ____: ____. If an expert's opinion involves scientific or specialized knowledge, a trial court considering a motion under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), must determine whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology can be properly applied to the facts in issue. Several nonexclusive factors are considered in making this determination: (1) whether a theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether, in respect to a particular technique, there is a high known or potential rate of error; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or technique enjoys general acceptance within a relevant scientific community.

10. ____: ____. In addition to determining the scientific reliability of proffered expert testimony, a trial court's gatekeeping function under the standard of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), requires that it determine whether such opinion testimony can properly be applied to the facts at issue. This inquiry, sometimes referred to as "fit," assesses

whether the scientific evidence will assist the trier of fact to understand the evidence or to determine the fact in issue by providing a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

11. ____: ____. Under the analysis in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), expert testimony lacks "fit" when a large analytical leap must be made between the facts and the opinion.

12. ____: ____. A court performing an inquiry under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), should not require absolute certainty, but should admit expert testimony if there are good grounds for the expert's conclusion, even if there could possibly be better grounds for some alternative conclusion.

13. **Rules of Evidence: Hearsay: Proof.** In order for statements to be admissible under Neb. Evid. R. 803(3), Neb. Rev. Stat. § 27-803(3) (Reissue 2008), the party seeking to introduce the evidence must demonstrate (1) that the circumstances under which the statements were made were such that the declarant's purpose in making the statements was to assist in the provision of medical diagnosis or treatment and (2) that the statements were of a nature reasonably pertinent to medical diagnosis or treatment by a medical professional.

14. **Rules of Evidence: Hearsay.** Statements admissible under Neb. Evid. R. 803(3), Neb. Rev. Stat. § 27-803(3) (Reissue 2008), need not be made to a physician.

15. **Rules of Evidence: Hearsay: Appeal and Error.** A statement gathered for dual medical and investigatory purposes can be admissible under Neb. Evid. R. 803(3), Neb. Rev. Stat. § 27-803(3) (Reissue 2008). The question is whether the statement, despite its dual purpose, was made in legitimate and reasonable contemplation of medical diagnosis or treatment. Whether a statement was taken and given in contemplation of medical diagnosis or treatment is a factual finding by the trial court, and an appellate court reviews that determination for clear error.

16. **Evidence: Appeal and Error.** Error can be based on a ruling that admits evidence only if the specific ground of objection is apparent either from a timely objection or from the context.

17. **Pretrial Procedure: Trial: Evidence: Appeal and Error.** Where there has been a pretrial ruling regarding the admissibility of evidence, a party must make a timely and specific objection to the evidence when it is offered at trial in order to preserve any error for appellate review.

18. **Trial: Waiver: Appeal and Error.** One may not waive an error, gamble on a favorable result, and, upon obtaining an unfavorable result, assert the previously waived error.

Appeal from the District Court for Scotts Bluff County: Leo Dobrovolny, Judge. Affirmed.

David S. MacDonald, Deputy Scotts Bluff County Public Defender, for appellant.

Jon Bruning, Attorney General, and George R. Love for appellee.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Stephan, J.

Carlos R. Herrera and Jennifer Herrera are the biological parents of A.H. and S.H., both minor children. In 2012, Carlos and Jennifer were separately charged in the district court for Scotts Bluff County with child abuse resulting in serious bodily injury to A.H. Following a consolidated jury trial, both were convicted of the lesser-included offense of child abuse. Carlos perfected this timely direct appeal.

## I. BACKGROUND

In an information filed on November 15, 2012, Carlos was charged with one count of intentional child abuse resulting in serious bodily injury, a Class II felony.[1] The alleged victim was A.H., and the alleged abuse occurred in Scotts Bluff County between January 2007 and October 12, 2011. A.H. was born on November 1, 2005. Similar charges were filed against Jennifer, and the two cases were subsequently consolidated for trial, at which Carlos and Jennifer were represented by separate counsel.

### 1. Pretrial Motions

#### (a) *Daubert*/*Schafersman* Hearing

Prior to trial, Carlos filed a motion requesting a *Daubert*/ *Schafersman*[2] hearing on the admissibility of expert testimony related to the medical diagnosis of "psychosocial dwarfism." Jennifer joined in this motion. At this hearing, the State presented two witnesses. Dr. Bruce Buehler, a geneticist and pediatrician, testified first. He explained that psychosocial dwarfism is also known as psychosocial short stature (PSS).

---

[1] Neb. Rev. Stat. § 28-707(7) (Reissue 2008 & Cum. Supp. 2010).

[2] See, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001).

Although various witnesses used the two terms interchangeably, the district court utilized the PSS nomenclature, and we do likewise.

Buehler testified that PSS occurs when the body stops making growth hormone in response to a stressful environment. He stated that PSS can be diagnosed by measuring the body's production of growth hormone before and after changing the individual's environment. If the production increases substantially after the change, the diagnosis is made. Buehler also testified that the diagnosis can be made empirically if only one variable, the individual's environment, is changed and growth then occurs.

Buehler testified that he first saw A.H. in approximately 2011. At the time, A.H. presented with short stature, failure to thrive, and developmental delays. Buehler did a myriad of tests on A.H. in order to discover why he was not growing. These included metabolic tests, chromosomal tests, and autism tests. According to Buehler, he tested for every possible known medical reason for A.H.'s lack of growth and found nothing. After A.H. was removed from his parents' home, his growth increased substantially, without medical intervention. That growth empirically proved to Buehler that A.H.'s condition was PSS. Buehler testified that while it is rare, the diagnosis of PSS has been peer reviewed and published and is considered a medical diagnosis recognized by insurance companies.

On cross-examination, Buehler readily admitted that he did not know anything about the environment A.H. was living in and did not know whether A.H. was being abused. He also admitted that he initially thought A.H. had a genetic condition, and he acknowledged that there are genetic conditions which are currently unknown and therefore undiagnosable. But he explained that for his purposes of diagnosis, it was enough that the removal from the environment caused A.H. to grow; he did not need to pinpoint the specific factor in the environment that caused lack of growth. On redirect, Buehler clarified that a change in the environment could not cure a genetic condition and that he was 100-percent certain A.H. suffered from PSS.

Dr. Suzanne Haney, a child abuse pediatrician, also testified for the State. She testified that PSS has been a medically recognized diagnosis since 1947 and has been subjected to peer review and publication. She stated that the condition is a rare condition but is generally recognized and accepted in the scientific community. It is diagnosed by ruling out all medical and genetic reasons for lack of growth, changing the environment, and seeing growth. Unlike Buehler, Haney had reviewed records of A.H.'s history and considered the allegations of abuse and neglect when making the diagnosis of PSS. She testified that indicators of PSS are a child of short stature, no medical cause for the lack of growth, and a history of "clear neglect, abuse." She testified that PSS could not be diagnosed without knowing the child's history and that the stress to the child must be severe.

On cross-examination, Haney admitted she had reviewed the case file and reports but otherwise had no knowledge of the environment A.H. had lived in. She also admitted that it is possible A.H. has a genetic condition that is currently unknown. She testified that the stress which causes PSS must be severe, but that the medical community does not know exactly why or how the stress causes the body to stop producing growth hormone. She also testified that it was highly unlikely that an undiagnosed genetic condition was the cause of A.H.'s lack of growth, because genetic conditions do not change based on environment.

Following the hearing, the district court issued a written order in which it identified the issue before it as "whether the diagnosis of . . . PSS . . . passes muster under a *Daubert/Schafersman* analysis and can go to the jury by way of witnesses Dr. Buehler, and Dr. Haney." The order noted that its gatekeeping function required the court to make a preliminary assessment whether the reasoning or methodology underlying the expert testimony was valid and whether that reasoning or methodology could properly be applied to the facts in issue.[3]

---

[3] See *id*.

The district court found that Buehler and Haney were both qualified experts as medical doctors and pediatricians. Buehler was additionally qualified in the areas of genetics, metabolism, endocrinology, and development. The court also found that the "'technique'" they used to conclude that A.H. suffered from PSS was a medical diagnosis, the process of determining the existence of a condition or disease that requires treatment. The technique here included obtaining a history, ruling out all other causes for the lack of growth, and monitoring A.H.'s response to his change in environment. The court also found that PSS is a generally accepted, medically recognized diagnosis in the medical community and has been for several decades. It also found that PSS has been the subject of peer review and publication and that there are standards in the medical community which must exist before a diagnosis can be made. Based on these factors, the district court determined that the reasoning and methodology used by Buehler and Haney were sound.

The district court further determined that the diagnosis of PSS was relevant to the facts at issue in the case, because it was the State's theory that PSS constituted the "serious bodily injury" charged in the information. The court specifically found that the diagnosis of PSS "can properly be applied to those facts in the course of a trial in this case."

#### (b) Prior Acts

Also prior to trial, the State filed a notice of its intent to present evidence of other crimes, wrongs, or acts pursuant to Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Cum. Supp. 2014). Carlos objected to the admission of this evidence, and an evidentiary hearing was held. The specific prior conduct at issue was that Carlos caused A.H. to suffer broken bones in 2005. The district court concluded that evidence of A.H.'s 2005 injuries was admissible against Carlos, because there was clear and convincing evidence that Carlos caused the injuries, the evidence was relevant to show stress and neglect related to PSS, and the evidence was relevant to show intent and absence of mistake or accident.

## 2. Trial

### (a) General Evidence of Abuse

Dr. William Arthur Waswick, a trauma surgeon practicing in Wichita, Kansas, testified that in December 2005, he treated A.H. in Wichita for a fractured left femur. At the time, A.H. was 7 weeks old. Waswick testified that the injury to the femur was acute, having occurred within the preceding 24 hours. He also found evidence at the time of an old elbow fracture and old rib fractures. Waswick regarded all of the fractures as consistent with nonaccidental trauma. Carlos did not make a § 27-404 objection to Waswick's testimony.

A.H.'s sister, S.H., testified at trial as a witness for the State. At the time, she was 8 years old and had completed the second grade. She stated that Carlos and Jennifer did not take care of A.H. She explained that A.H. ate at a different table than the rest of the family and that he slept in the basement in a dog kennel. She testified that Carlos and Jennifer did not feed A.H. and that they spanked him. According to S.H., Jennifer hit A.H. with a black belt and a pink "flip flop" and Carlos hit A.H. with a black belt and a brown shoe. S.H. testified that Jennifer hit A.H. in the head with the flip-flop, leaving a pink and red mark on his forehead.

Two teachers and a former paraeducator testified that when A.H. attended preschool in 2010 and 2011, they observed various cuts, bumps, and marks on his body. Two nurses who examined A.H. at an emergency room on separate occasions in October 2011 testified that they observed atypical injuries to A.H. that were suspicious for abuse; one testified that the injuries were bruises that resembled footprints or shoe marks.

A forensic scientist employed by the Nebraska State Patrol testified that he did a footwear analysis on a pair of pink flip-flops removed from the home shared by Carlos, Jennifer, A.H., and S.H., and found that the pattern on the bottom of the footwear was consistent with a pattern found on A.H.'s face and back in photographs taken in October 2011. The scientist also analyzed a sample of the carpet located on the stairs of the Herrera home in October 2011 and found the carpet could

not have caused the patterns found on A.H.'s face and back. In addition, photographs of A.H. taken by police on October 12, 2011, depict a bruise on his forehead containing what resembles a shoeprint, bruises on his body, and a rash covering most of his body.

### (b) Expert Testimony
### Regarding PSS

Both Buehler and Haney testified about PSS at trial over renewed *Daubert/Schafersman* objections, which were overruled. Buehler's testimony was largely consistent with his testimony from the *Daubert/Schafersman* hearing. He did not opine about the specific environmental stress which caused A.H. to have PSS, but he did testify that other situations in which he had diagnosed PSS involved children being removed from war zones in Vietnam and Cambodia and noted that they had been subjected to "continuous trauma." He explained that after ruling out other causes for A.H.'s lack of growth, he asked social workers to investigate A.H.'s home environment, because environment can cause the body to stop producing growth hormone. He further testified that in the course of his examination of A.H., he had seen bruises that caused him some concern about A.H.'s environment. Buehler also testified that A.H.'s increase in growth after being removed from his home environment was "[a]mazingly significant." He clarified on cross-examination that he had never viewed A.H.'s home environment and had no information at all about it. He also stated that he did not know all of the causes of PSS, only the "end point."

Haney's trial testimony was also similar to her testimony at the *Daubert/Schafersman* hearing. She added at trial that normal growth for a child is 2 inches a year and that in the 7 months after he was removed from his home, A.H. grew almost 6 inches. She did not opine about any specific cause of A.H.'s PSS, but did explain that the condition is generally caused by "chronic ongoing stress" or "chronic trauma." Haney also explained that PSS is the result of "environmental abuse." She generally implied, particularly during her cross-examination, that A.H.'s PSS was caused by abuse in

his home environment, but also admitted that the "severe trauma" necessary to cause PSS could be something other than abuse. Haney explained that the long-term effects of PSS were increased risk for heart disease, lung cancer, autoimmune disease, and obesity. Buehler, on the other hand, testified that the long-term effect of PSS on A.H. would be a decrease in his adult height.

### 3. Capstone Interviews

Carlos and Jennifer called Vicki Moreno as a witness. Moreno is a special investigator for the Scotts Bluff County Attorney's office. She testified that she conducted a forensic interview of A.H. on October 13, 2011, and of S.H. on October 10, 2011. Moreno also testified that she had interviewed both A.H. and S.H. on May 5, 2009, and again on June 4, 2009. The interviews were apparently conducted at the CAPstone Child Advocacy Center in Scottsbluff, Nebraska, and are referred to by the parties as the "Capstone interviews."

Moreno explained that in 2009, she was asked to interview the children after A.H. had been seen in an emergency room with a cut on his head. Her objective was to determine whether he had been abused. At the time of the 2009 interviews, S.H. was 4 years old and A.H. was 3 years old. S.H. told Moreno that A.H. cut his head when she pushed him into a toybox. Moreno asked S.H. in 2009 whether anybody at her house got a spanking, and S.H. said no. Moreno also said to S.H., "'I was talking to another little girl and she was telling me she gets spankings do you ever get spankings.'" S.H. answered no. Moreno testified that during the 2009 interview, she received no information from S.H. that led her to believe A.H. was being abused. She further testified that during that interview, S.H. repeatedly talked about A.H.'s being in or sleeping in his bed. Moreno testified that during her 2011 interview of A.H., he told her he had fallen down the stairs and had not gotten a spanking.

Moreno testified that there is a proper way to ask children questions during a forensic interview. She admitted that some of the questions she asked A.H. and S.H. were "suggestive," but maintained they were properly designed to elicit relevant

information. She specifically testified that it was not possible that she "planted ideas in their mind."

Defense counsel called Dr. Robert Barden, a psychologist and an attorney, as an expert witness. He testified about how memories can be contaminated, especially when interviewing children. Specifically, Barden testified that the interviewer must not put facts into the questions that are asked, because there is a danger that children will incorporate those facts into their memories and later believe them to be true. Barden reviewed the Capstone interviews of A.H. and S.H. and testified that there were "many, many mistakes" made by the interviewers. In particular, he noted that S.H.'s reports of what occurred changed dramatically during the course of the interviews. He opined that one reason for this could be that S.H. felt safer as time progressed, but that another reason could be that she had developed false memories because of improper interview techniques.

Barden was asked about the May 2009 interview of S.H. and testified that her responses changed as the questions changed. He noted that early in the interview, the questions were proper, such as "'What happened?'", but that later in the interview, the questions were improper, such as "[D]oes anybody at your house get a spanking?" He specifically testified that S.H.'s testimony about A.H.'s sleeping in the dog kennel in the basement was an example of one of the "tremendous transformations" in her memory report from 2009 to 2011.

Barden testified that certain questions asked of S.H. in 2009 were particularly inappropriate, including the reference to "'another little girl'" being spanked, asking S.H. whether she had bitten A.H., and asking S.H. to "[t]ell me where daddy hits you." He explained that these were improper because they inserted facts that S.H. did not otherwise volunteer. Barden noted that in S.H.'s 2011 interview, she said that she shared her room with A.H., which differed significantly from her trial testimony. He further noted that in a subsequent interview in 2011, S.H. again said that A.H. slept in her room, and then was told by the interviewer that S.H.'s sister (who was 2 years old at the time) had said that A.H. slept in the basement.

Barden opined that this was improper because it implanted memories in S.H.

Barden further testified that even the questions asked of S.H. during trial contained improper facts, and Barden expressed concern that few of the interviewers of S.H. knew much about basic memory issues.

### 4. OTHER DEFENSE WITNESSES

Two of Carlos' sisters and his father all testified that they had spent significant time with Carlos, Jennifer, and A.H., and had no concerns about child abuse. In addition, both Carlos and Jennifer testified and denied the allegations of abuse. Jennifer explained that due to his developmental disabilities, A.H. often fell and always hit the same spot on his head. She stated that in October 2011, A.H. fell down the stairs, and she denied hitting him with a shoe. Carlos also testified that A.H. fell down the stairs in October 2011, and Carlos denied ever spanking, hitting, or pushing A.H.

### 5. VERDICT AND JUDGMENT

After hearing the evidence, the jury found both Carlos and Jennifer guilty of the lesser-included offense of child abuse. Jennifer was sentenced to 12 to 24 months' imprisonment, and Carlos was sentenced to 48 to 60 months' imprisonment. Carlos filed this timely appeal, which we moved to our docket pursuant to our authority to regulate the caseloads of the appellate courts of this state.[4] Jennifer filed a separate appeal, which was argued and submitted on the same day as this appeal but not consolidated for disposition.

## II. ASSIGNMENTS OF ERROR

Carlos assigns, renumbered and partially restated, that the district court erred in (1) receiving evidence of the PSS diagnosis over his *Daubert/Schafersman* objection, (2) not receiving the recorded Capstone interviews of A.H. and S.H. in evidence "to show the change in the testimony of the children over the course of the case," and (3) receiving evidence relating to the injuries sustained by A.H. in 2005.

---

[4] See Neb. Rev. Stat. § 24-1106(3) (Reissue 2008).

## III. STANDARD OF REVIEW

[1-3] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[5] The standard for reviewing the admissibility of expert testimony is abuse of discretion.[6] We review the record de novo to determine whether a trial court has abdicated its gatekeeping function when admitting expert testimony.[7]

## IV. ANALYSIS

### 1. Expert Testimony
### of PSS Diagnosis

The offense of child abuse carries different classifications and penalties, depending upon whether it was committed negligently, as opposed to knowingly and intentionally, and the extent of any resulting injury.[8] Carlos was charged with knowing and intentional child abuse resulting in serious bodily injury, which is a Class II felony.[9] In order to meet its burden of proving serious bodily injury, the State sought to use the expert testimony of Buehler and Haney to show that A.H. suffered from PSS as a result of the abuse. In Carlos' first assignment of error, he contends the district court erred in receiving that expert testimony over his objection.

[4-6] The Nebraska Evidence Rules provide: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."[10] In *Schafersman v. Agland*

---

[5] *State v. Valverde*, 286 Neb. 280, 835 N.W.2d 732 (2013); *State v. Freemont*, 284 Neb. 179, 817 N.W.2d 277 (2012).

[6] *State v. Casillas*, 279 Neb. 820, 782 N.W.2d 882 (2010); *State v. Edwards*, 278 Neb. 55, 767 N.W.2d 784 (2009).

[7] *Id*.

[8] § 28-707.

[9] § 28-707(7).

[10] Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 2008).

*Coop*,[11] we adopted the standards which the U.S. Supreme Court set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[12] to determine whether expert testimony is admissible under § 27-702. Under the principles set forth in *Daubert/Schafersman*, the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion.[13] The purpose of this gatekeeping function is "to ensure that the courtroom door remains closed to 'junk science' that might unduly influence the jury, while admitting reliable expert testimony that will assist the trier of fact."[14] The intent of the *Daubert/Schafersman* test was to relax the traditional barriers to expert testimony by permitting courts to receive expert testimony based on "good science" even before that science became generally accepted.[15]

[7] A challenge to the admissibility of evidence under *Daubert/Schafersman* should take the form of a concise pretrial motion.[16] It should identify, in terms of the *Daubert/Schafersman* factors, what is believed to be lacking with respect to the validity and reliability of the evidence and any challenge to the relevance of the evidence to the issues of the case.[17] In order to preserve judicial economy and resources, the motion should include or incorporate all other bases for challenging the admissibility, including any challenge to the qualifications of the expert.[18]

Carlos filed a pretrial motion requesting a *Daubert/Schafersman* hearing on the admissibility of evidence about PSS. In the motion, he questioned whether "the theory of [PSS]" had been tested, had been subjected to peer review and

---

[11] *Schafersman, supra* note 2.

[12] *Daubert, supra* note 2.

[13] *Casillas, supra* note 6; *Zimmerman v. Powell*, 268 Neb. 422, 684 N.W.2d 1 (2004).

[14] *Casillas, supra* note 6, 279 Neb. at 834, 782 N.W.2d at 896.

[15] *Casillas, supra* note 6. See *Daubert, supra* note 2.

[16] *Casillas, supra* note 6.

[17] *Id*.

[18] *Id*.

publication, had been analyzed for potential rate of error, had standards, or had attained general acceptance in the relevant scientific community. Defense counsel informed the court prior to the hearing that his intention was to challenge the "validity of a diagnosis of [PSS]."

### (a) Professional Qualifications of Expert Witnesses

[8] Before admitting expert opinion testimony, the trial court must determine whether the expert's knowledge, skill, experience, training, and education qualify the witness as an expert.[19] After reviewing the professional qualifications of Buehler and Haney, the district court determined that as medical doctors who see patients regularly and teach and write in their fields, they were qualified to testify as experts. The court noted that each possessed special skill and knowledge, "particularly with children," and that "[f]ormations of judgments by them can have probative value due to this knowledge and skill, which is superior to persons in general." The court concluded that there was "no question that they can properly testify as experts in the practice of medicine regarding children."

The record fully supports this finding. The fact that neither Buehler nor Haney claimed to have any special expertise in the study of PSS does not mean that they are not qualified, as physicians, to diagnose the condition, provided that they do so in accordance with scientifically valid methodology and principles.

### (b) Scientific Validity of PSS Diagnosis

[9] If an expert's opinion involves scientific or specialized knowledge, as the opinions of Buehler and Haney clearly did, a trial court must determine whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology can be properly applied to the facts in issue.[20] Several nonexclusive factors are considered

---

[19] *Id.*

[20] See, *id*.; *State v. Daly*, 278 Neb. 903, 775 N.W.2d 47 (2009).

in making this determination: (1) whether a theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether, in respect to a particular technique, there is a high known or potential rate of error; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or technique enjoys general acceptance within a relevant scientific community.[21]

On appeal, we understand Carlos to make two arguments regarding the scientific validity of the opinions expressed by Buehler and Haney with respect to PSS. First, he argues that the diagnosis itself is lacking in scientific validity and is, essentially, "junk science." Second, he challenges the validity of the methodology which Buehler and Haney utilized in diagnosing A.H. with this condition.

Both Buehler and Haney testified that the diagnosis of PSS has been subjected to peer review and publication and is generally accepted in the medical community as a scientifically valid diagnosis. Each produced current medical literature describing the condition. The condition is described in one medical publication as "a disorder of short stature or growth failure and/or delayed puberty of infancy, childhood, and adolescence that is observed in association with emotional deprivation, a pathologic psychosocial environment, or both." Both physicians testified that the condition is listed in a publication of diagnoses for which insurance companies will provide compensation. Both described standards by which the condition is diagnosed.

Based upon our review of the record, we agree with the district court that PSS is a "generally accepted, medically recognized diagnosis" which is based upon good science.

### (c) Diagnostic Methodology

The methodology employed by Buehler and Haney in formulating their opinions that A.H. suffered from PSS is one of

---

[21] *Casillas, supra* note 6; *Daly, supra* note 20.

differential diagnosis. As we noted in *Carlson v. Okerstrom*,[22] differential diagnosis is a generally accepted technique in the medical community which has been peer reviewed and "'does not frequently lead to incorrect results.'" But under the *Daubert/Schafersman* standard, the question is "whether the expert conducted a *reliable* differential diagnosis."[23] In *Carlson*, we explained that a reliable differential diagnosis involves first compiling a comprehensive list of hypotheses that might explain the condition at issue and then eliminating or ruling out potential hypotheses in a reasoned manner. In the second step of the process, the question is whether the expert had a "reasonable basis for concluding that one of the plausible causative agents was the most likely culprit for the patient's symptoms."[24]

Here, Buehler testified that when seeing a patient who is of abnormally short stature, he does an "extensive workup" consisting of multiple tests to determine whether there is a treatable medical condition which would explain the impaired growth. When he first saw A.H. and observed his abnormally short stature and other distinctive physical characteristics, Buehler suspected a metabolic disease or genetic condition was impairing A.H.'s growth. He ordered a series of approximately 500 metabolic and genetic tests to determine a cause for the lack of growth, but all of these tests were negative. Buehler testified that by this process, he eliminated all metabolic and genetic causes of impaired growth for which it was possible to test.

When Buehler saw A.H. again approximately 3 months after A.H. had been removed from his parents' home, A.H. had started to grow, despite the fact that Buehler had not prescribed any sort of medication or growth hormone

---

[22] *Carlson v. Okerstrom*, 267 Neb. 397, 413, 675 N.W.2d 89, 105 (2004), quoting *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3d Cir. 1994).

[23] *Carlson, supra* note 22, 267 Neb. at 414, 675 N.W.2d at 105.

[24] *Id*. at 414, 675 N.W.2d at 106. See, also, *Epp v. Lauby*, 271 Neb. 640, 715 N.W.2d 501 (2006).

therapy for him. Buehler explained his diagnosis of PSS as follows: "Empirically I had ruled out any of the short stature syndrome[s] I could have tested for, his environment changed and he grew; therefore, empirically, . . . he had restarted his growth hormone and that's the definition of [PSS]." Buehler testified that he reached his diagnosis of PSS with reasonable medical certainty.

Haney formulated her opinions in a similar manner, based upon her review of medical records, photographs, and other documentation pertaining to A.H. She testified that the extensive testing reflected in the medical records ruled out any underlying medical or genetic condition which could be responsible for A.H.'s abnormal growth rate while he resided with his parents, leading her to believe that some other factor must be the cause. Haney reviewed records of unexplained fractures sustained by A.H. in 2005, reports from school officials that he was excessively hungry, and photographs of A.H., which all caused her to suspect physical abuse. She testified that A.H. had a "significant growth spurt much more than would be expected of a child of that age that started shortly after he was placed in foster care and continued." Based upon all of this information, Haney opined with reasonable medical certainty that A.H. suffered from PSS.

We conclude that both experts applied scientifically valid methodology in arriving at the diagnosis of PSS.

### (d) Relevance

[10,11] In addition to determining the scientific reliability of proffered expert testimony, a trial court's gatekeeping function under the *Daubert*/*Schafersman* standard requires that it determine whether such opinion testimony can properly be applied to the facts at issue.[25] This inquiry, sometimes referred to as "fit," assesses whether the scientific evidence will assist the trier of fact to understand the evidence or to determine the fact in issue by providing a "'valid scientific connection to the pertinent inquiry as a precondition to

---

[25] *Daly, supra* note 20; *Schafersman, supra* note 2.

admissibility.'"[26] Under the *Daubert/Schafersman* analysis, expert testimony lacks "fit" when a large analytical leap must be made between the facts and the opinion.[27] For example, in *McNeel v. Union Pacific RR. Co.*,[28] we assumed without deciding that a railroad worker's diagnosis of toxic encephalopathy was the product of scientifically reliable methodology, but held that it could not have assisted the trier of fact in a case under the Federal Employers' Liability Act, because there was no evidence that the worker was exposed to a toxic agent as a result of some act or omission on the part of his employer.

Here, the district court determined that the expert testimony was relevant to the issue of whether the alleged child abuse resulted in "serious bodily injury," which was an element of the charged offense. Carlos argues that this was error because neither Buehler nor Haney had personal knowledge of any actual abuse suffered by A.H. while he lived with his parents. We find no merit in this argument. Both Buehler and Haney testified at trial that the diagnosis of PSS attributes a child's lack of growth to chronic stress in the child's environment, which disrupts the production of growth hormone. Other witnesses provided direct and circumstantial evidence from which a finder of fact could reasonably infer that A.H. was subjected to chronic environmental stress in the form of parental abuse. Unlike *McNeel*, this record reflects that A.H. was actually subjected to the factors which trigger the diagnosis reached by the expert witnesses. Thus, there was a "fit" between the facts at issue and the challenged expert testimony. The expert testimony was relevant, and its probative value was not substantially outweighed by the danger of unfair prejudice. The district court did not err in overruling objections to its admissibility.

---

[26] *McNeel v. Union Pacific RR. Co.*, 276 Neb. 143, 153, 753 N.W.2d 321, 330 (2008), quoting *Daubert, supra* note 2.

[27] *Id.*; *Bowers v. Norfolk Southern Corp.*, 537 F. Supp. 2d 1343 (M.D. Ga. 2007).

[28] *McNeel, supra* note 26.

## (e) Resolution

[12] A court performing a *Daubert/Schafersman* inquiry should not require absolute certainty, but should admit expert testimony if there are good grounds for the expert's conclusion, even if there could possibly be better grounds for some alternative conclusion.[29] Based upon our de novo review of the record, we conclude that the district court did not abdicate its role as gatekeeper with respect to the expert testimony of Buehler and Haney. Both were qualified experts who provided rational explanation and empirical support for their opinions that A.H. suffered from PSS, a rare but generally accepted and recognized diagnosis in the medical community. The opinions of these experts were relevant to the issue of whether A.H. sustained a serious bodily injury, which was an element the State was required to prove in order to obtain a conviction on the charged offense. The probative value of the experts' opinions was not substantially outweighed by the danger of unfair prejudice. The district court did not err in permitting the experts to testify at trial over *Daubert/Schafersman* objections.

## 2. CAPSTONE INTERVIEWS

During Moreno's testimony, defense counsel offered DVD recordings of the Capstone interviews. The district court sustained the State's hearsay objections to the video recordings. Carlos argues that the recordings were offered to demonstrate improper interviewing technique on the part of Moreno, the investigator employed by the Scotts Bluff County Attorney's office who conducted most of the interviews, and changes in the responses of the children over a period of time. As such, he argues that they were not hearsay as defined by Neb. Evid. R. 801(3), Neb. Rev. Stat. § 27-801(3) (Reissue 2008), because they were not offered to prove the truth of the matters asserted. Alternatively, he argues that the recorded interviews were statements which, at least in part, were made for the purposes of medical diagnosis or treatment and therefore fall

---

[29] *Daly, supra* note 20; *King v. Burlington Northern Santa Fe Ry. Co.*, 277 Neb. 203, 762 N.W.2d 24 (2009).

within the exclusion to the hearsay rule stated in Neb. Evid. R. 803(3), Neb. Rev. Stat. § 27-803(3) (Reissue 2008).

The offer of this evidence was made during the examination of Moreno, who was called as a witness by Carlos and questioned closely by his counsel regarding the manner in which she conducted the interviews. Moreno stated she attempted to follow "all of the proper protocols" for interviewing the children. During a recess, Carlos' counsel advised the court that he intended to use the recorded interviews as extrinsic evidence of prior inconsistent statements of S.H., who had previously testified as a witness for the State. He also advised the court that the interviews needed to be in evidence so that Barden, the defense expert who had not yet testified, could analyze the propriety of the interviewing techniques. Although no formal offer had been made, the court advised counsel that he viewed the provisions of Neb. Evid. R. 613, Neb. Rev. Stat. § 27-613 (Reissue 2008), dealing with extrinsic evidence of prior inconsistent statements by a witness as controlling the admissibility of the Capstone interviews. The court advised counsel that it would permit him to utilize excerpts from the interviews dealing with questions asked of S.H., but would not permit the entire interviews to come into evidence. The court instructed counsel to mark the excerpts he intended to use as an exhibit and submit it for the court's review, and counsel agreed to do so. Moreno was then temporarily excused while defense counsel called another witness.

When Moreno's direct examination resumed, Carlos' counsel was permitted over the State's objection to utilize interview transcripts, identified as exhibits 108 and 109, to examine her about specific questions directed to S.H. and her responses. Although counsel stated that he intended to offer the transcripts into evidence, the court observed that he could attempt to do so but that there was insufficient foundation at that point. No formal offer was made before the trial recessed for the day. Exhibits 108 and 109 are not included in our bill of exceptions.

Before the trial resumed the following day, both defense counsel advised the court that Carlos' counsel would conclude his examination of Moreno and that Jennifer's counsel

would offer the entire recorded interviews to be played for the jury during his examination of Moreno. Jennifer's counsel subsequently examined Moreno about specific questions she asked the children and whether they were "highly suggestive." Moreno responded that in some instances her questions may have been suggestive but not improperly so. Jennifer's counsel then offered exhibits 111 through 113. The State objected on grounds of relevance, foundation, and hearsay. Carlos' counsel did not specifically join in the offer, but stated that he had no objection to the exhibits and argued for their admissibility. Although the record is not entirely clear in this respect, we will treat the offer of these exhibits as having been jointly made by counsel for Carlos and Jennifer.

The court sustained the hearsay objection to each exhibit. It stated that portions of the interview of S.H. may be admissible as extrinsic evidence of prior inconsistent statements, but noted that the recordings had not been submitted to him for pretrial review and concluded: "I'm not going to admit the entire tape and let the jury see the whole thing and try to figure out what it is you are talking about."

We find no abuse of discretion in this ruling. The recorded interviews contained hearsay. Specific questions or answers may have been admissible for purposes other than establishing the truth of the matters asserted, such as impeaching S.H. with prior inconsistent statements or attacking the credibility of Moreno by demonstrating improper interviewing techniques. But at the time these exhibits were offered, the jury would have had no way of determining whether Moreno's techniques were improper or not. And we agree with the district court that it was the responsibility of defense counsel to identify specific portions of the recorded interviews which were being offered for purposes other than the truth of the matter asserted. Counsel did not do so at trial or on appeal.

Moreover, Carlos was not prejudiced by the district court's ruling on the recorded interviews because of what transpired after the ruling. Barden, the defense expert, testified that he reviewed all of the interviews. He expressed his opinion that improper interviewing techniques were used, and quoting from

the interviews, he gave specific examples of what he considered unduly suggestive questioning and highlighted changes in the accounts given by the children in response to repeated questioning. In this way, Carlos placed the issue of improper interviewing techniques before the jury in a focused and intelligible manner which could not have been achieved by simply having the jury view the recorded interviews. And we note that Carlos did not reoffer all or any portions of exhibits 111, 112, or 113 during or after Barden's testimony.

[13] Nor are we persuaded by Carlos' alternative argument that the entire interviews were admissible under § 27-803(3). That rule provides a hearsay exception for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations . . . as reasonably pertinent to diagnosis or treatment."[30] Section 27-803(3) is based on the notion that a person seeking medical attention will give a truthful account of the history and current status of his or her condition in order to ensure proper treatment.[31] In order for statements to be admissible under § 27-803(3), the party seeking to introduce the evidence must demonstrate (1) that the circumstances under which the statements were made were such that the declarant's purpose in making the statements was to assist in the provision of medical diagnosis or treatment and (2) that the statements were of a nature reasonably pertinent to medical diagnosis or treatment by a medical professional.[32]

[14,15] Statements admissible under § 27-803(3) need not be made to a physician.[33] A child's statements to a therapist describing sexual abuse have been found admissible under this rule.[34] So too have statements by a child's foster mother to a therapist describing unusual sexual behavior by the child.[35]

---

[30] § 27-803(3).

[31] *State v. Vigil*, 283 Neb. 129, 810 N.W.2d 687 (2012).

[32] *Id*.

[33] *Id*.

[34] *In re Interest of B.R. et al.*, 270 Neb. 685, 708 N.W.2d 586 (2005).

[35] *Id*.

The statement need not be solely for the purpose of medical diagnosis or treatment; a statement gathered for dual medical and investigatory purposes can be admissible under § 27-803(3).[36] The question is whether the statement, despite its dual purpose, was made in legitimate and reasonable contemplation of medical diagnosis or treatment.[37] Whether a statement was taken and given in contemplation of medical diagnosis or treatment is a factual finding by the trial court, and we review that determination for clear error.[38]

In *State v. Vigil*,[39] a 12-year-old girl told her mother that her stepfather had been sexually abusing her for 2 years. The mother took the child to an advocacy center at a local hospital. The child was interviewed there by an interviewer whose purpose was to gather information to determine a medical or psychological diagnosis and a recommended treatment plan. We held that the details of the interview fell within § 27-803(3) even though it was for the dual purpose of investigation and medical diagnosis, because it was clear that it was legitimately used for medical treatment.

Here, the record contains very little information about how and when the interviews were conducted. Most important, there is no basis in the record to support a finding that the interviews were conducted even in part for the purpose of medical diagnosis. The district court did not abuse its discretion in ruling that the interviews were not admissible under § 27-803(3).

### 3. Evidence of Prior Acts

Carlos argues that the district court erred in receiving Waswick's testimony regarding nonaccidental injuries sustained by A.H. in 2005. He contends that this evidence was inadmissible under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008), and § 27-404(2) of the Nebraska Evidence Rules. Although Carlos objected to this evidence at the pretrial

---

[36] *Vigil, supra* note 31.

[37] *Id.*

[38] *Id.*

[39] *Id.*

hearing, he did not renew his § 27-404 objection to Waswick's testimony at trial.

[16,17] Error can be based on a ruling that admits evidence only if the specific ground of objection is apparent either from a timely objection or from the context.[40] We have interpreted this rule to mean that where there has been a pretrial ruling regarding the admissibility of evidence, a party must make a timely and specific objection to the evidence when it is offered at trial in order to preserve any error for appellate review.[41] Thus, when a motion in limine to exclude evidence is overruled, the movant must object when the particular evidence which was sought to be excluded by the motion is offered during trial to preserve error for appeal.[42] Similarly, the failure to object to evidence at trial, even though the evidence was the subject of a previous motion to suppress, waives the objection, and a party will not be heard to complain of the alleged error on appeal.[43]

[18] The same principles apply to pretrial rulings on the admissibility of prior acts evidence. The defendant in *State v. Trotter*[44] was convicted of child abuse resulting in serious bodily injury. On appeal, he argued that the trial court erred in refusing to suppress before trial, and admitting at trial, evidence regarding his prior abuse of the victim under §§ 27-403 and 27-404. But he did not object to the evidence at trial, and we held that his failure to do so resulted in a waiver of any claimed error. We reach the same conclusion here. As we said in *State v. Pointer*,[45] "[w]ithout an objection by defendant at trial, the trial court has no obligation to interject itself into the proceedings to make rulings not requested." And as we concluded in *Trotter*, "One may not waive an error, gamble on

---

[40] Neb. Evid. R. 103(1)(a), Neb. Rev. Stat. § 27-103(1)(a) (Reissue 2008); *State v. Huston*, 285 Neb. 11, 824 N.W.2d 724 (2013).

[41] See, *Huston, supra* note 40; *State v. Schmidt*, 276 Neb. 723, 757 N.W.2d 291 (2008); *State v. Pointer*, 224 Neb. 892, 402 N.W.2d 268 (1987).

[42] *Id.*

[43] *In re Interest of Ashley W.*, 284 Neb. 424, 821 N.W.2d 706 (2012).

[44] *State v. Trotter*, 262 Neb. 443, 632 N.W.2d 325 (2001).

[45] *Pointer, supra* note 41, 224 Neb. at 894, 402 N.W.2d at 270.

a favorable result, and, upon obtaining an unfavorable result, assert the previously waived error."[46] This assignment of error is without merit.

## V. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court in all respects.

AFFIRMED.

_____

[46] *Trotter, supra* note 44, 262 Neb. at 467, 632 N.W.2d at 344.

_____

STATE OF NEBRASKA, APPELLEE, V.
ANTONIO BANKS, APPELLANT.
___ N.W.2d ___

Filed December 5, 2014.    No. S-13-740.

1. **Jurisdiction: Appeal and Error.** An appellate court determines jurisdictional questions that do not involve a factual dispute as a matter of law.
2. **Effectiveness of Counsel: Appeal and Error.** A claim that defense counsel provided ineffective assistance presents a mixed question of law and fact. When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error. With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), an appellate court reviews such legal determinations independently of the lower court's decision.
3. **Jurisdiction: Appeal and Error.** Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it.
4. **Postconviction: Final Orders: Appeal and Error.** An order denying an evidentiary hearing on a postconviction claim is a final judgment as to that claim, and under Neb. Rev. Stat. § 25-1912 (Reissue 2008), a notice of appeal must be filed with regard to such a claim within 30 days.
5. **Jurisdiction: Time: Appeal and Error.** Failure to timely appeal from a final order prevents an appellate court's exercise of jurisdiction over the claim disposed of in the order.
6. **Postconviction: Constitutional Law: Proof.** A court must grant an evidentiary hearing to resolve the claims in a postconviction motion when the motion contains factual allegations which, if proved, constitute an infringement of the defendant's rights under the state or federal Constitution.