IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. DANON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

STEVEN DANON, APPELLANT.

Filed July 2, 2024.   No. A-23-201.

Appeal from the District Court for Douglas County: JAMES M. MASTELLER, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, Christine A. Mori, and Travis L. Wampler, for appellant.

Michael T. Hilgers, Attorney General, and P. Christian Adamski for appellee.

MOORE, ARTERBURN, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Steven Danon appeals from his jury convictions for seven counts of first degree sexual assault; six counts of third degree sexual assault of a child; and one count of first degree sexual assault of a child. He contends that the district court erred in consolidating cases involving multiple victims and in various evidentiary rulings resulting in a violation of his right to confrontation. He further contends that the evidence was insufficient to support his convictions, the sentence imposed was excessive, and he received ineffective assistance of counsel. For the reasons stated herein, we affirm.

- 1 -

## II. STATEMENT OF FACTS

### 1. BACKGROUND

This appeal involves allegations that Danon sexually assaulted numerous victims over the course of years. Some of those victims alleged that they became friends with Danon's son and spent overnights at Danon's home eventually leading to sexual abuse. Other victims testified that when they were underage, they met Danon on dating apps or websites and that after meeting Danon, he sexually assaulted them.

Following an investigation, in June 2021, the State filed an information charging Danon with multiple counts of sexual assault involving three victims: B.H., A.M. and C.M. One of the victims, B.H., was deceased. After additional victims came forward, the State charged Danon in a separate information with additional counts of sexual assault involving three different victims--M.S., G.C., and J.N.

Following the filing of the second information, Danon filed a motion to sever, and for separate trials to be held, regarding the charges associated with each alleged victim. Shortly thereafter, the State moved to consolidate the two informations pursuant to Neb. Rev. Stat. § 29-2002 (Reissue 2016). In its brief in support of consolidation, the State indicated that, after it had filed the initial case against Danon, additional victims came forward to report similar allegations. These reports led to the State filing a second information against Danon. The State alleged that joinder was appropriate because the charges were of the same or similar character, based upon the same act or transaction, and constituted a common scheme or plan to sexually assault a child. The State further argued that the evidence would be admissible in separate trials and therefore the court should deny Danon's motion to sever; that the evidence of each crime was admissible under Neb. Rev. Stat. § 27-414 (Reissue 2016); and that joinder of the charges would not prejudice Danon. The district court granted the State's motion to consolidate and denied Danon's motion to sever.

After the court granted the State's motion to consolidate the cases, the State filed its third amended information. This operative amended information charged Danon with a combined total of 17 counts of sexual assault pertaining to seven victims--B.H., A.M., C.M., M.S., G.C., J.N., and newly identified victim M.H. For each of the following three victims, B.H., A.M., and C.M., Danon was charged with two counts of first degree sexual assault, Class II felonies; and two counts of third degree sexual assault of a child, Class IIIA felonies. As to victim M.S., Danon was charged with first degree sexual assault of a child, a Class IB felony; and as to victim M.H., Danon was charged with first degree sexual assault due to mental or physical incapacity, a class II felony. Although Danon was also charged with offenses related to victim J.N., those offenses were later dismissed by the State and will not be addressed further. Additionally, because the jury found Danon not guilty of the charge of first degree sexual assault of G.C., we do not include facts related to that offense unless it provides context to the other charges.

### 2. PRETRIAL MOTIONS

Prior to trial, Danon filed a motion to offer evidence pursuant to Neb. Rev. Stat. § 27-412 (Cum. Supp. 2022), and a motion to declare § 27-412 unconstitutional as applied. In the motion, Danon sought to offer evidence that the alleged victims engaged in "homosexual contact with

others, not [Danon], prior to any sexual interaction with [Danon]" in order to rebut the State's theory that Danon groomed the alleged victims. He further stated that the denial of his right to adduce evidence related to the victims' past sexual acts violated his constitutional rights including his right to due process. The district court denied Danon's motion.

Danon also filed motions in limine to prevent the State from, inter alia, offering or adducing evidence or testimony related to B.H.'s medical, psychiatric, and counseling records and adducing evidence of sexually graphic messages between Danon and uncharged acts related to other victims. The district court denied Danon's motion in limine governing his challenge to the medical records, finding that the contents of the records were admissible under Neb. Rev. Stat. § 27-803(4) (Cum. Supp. 2022) as they were made for the purpose of medical diagnosis and treatment. The district court held in abeyance a ruling related to Danon's motion in limine to preclude the State from offering any sexually graphic messages between Danon and some of the victims.

### 3. JURY TRIAL

A jury trial was held over 9 days in October 2022. The State adduced testimony from witnesses including: Helene Paulin, B.H.'s mother; Ashley Benakis, B.H.'s therapist; James Fortner, a friend of both B.H. and Danon's son; A.M.; G.C.; C.M.; M.H.; and M.S. For his defense, Danon adduced testimony from witnesses including his son, Joshua Danon; and Sherrill Berendse and Pavel Kuzma, who, during certain periods of time, had rented a room in Danon's home.

### (a) Evidence Related to B.H.

#### (i) Testimony From B.H.'s Mother

B.H.'s mother testified that B.H. and Danon's son, Joshua Danon, met when they were around 9 months old and in the same daycare, and as they got older they became best friends. She testified that because their sons were so close, she and Danon also became so close that she felt like they were siblings. B.H.'s mother testified that B.H. and Joshua had multiple sleepovers at both her house and Danon's house. B.H.'s mother testified that around the time that B.H. was in his early 20s, she began noticing that he had a problem with substance abuse. B.H.'s mother testified that eventually B.H. agreed to enter an inpatient treatment program and in September 2018, when B.H. was 25 years old, he checked into a treatment facility. B.H.'s mother testified that while B.H. was completing treatment, she, B.H., and B.H's therapist, participated in a family therapy session wherein B.H. disclosed that "[Danon] had been abusing him from the time he was a little boy." Sometime thereafter, B.H. was discharged from the treatment facility and entered a sober living facility program. B.H.'s mother stated that, while at the sober living facility, B.H. died in May 2020 after ingesting a pill that contained fentanyl.

#### (ii) Testimony From Ashley Benakis

Benakis testified that she began treating B.H. after he was admitted to a co-occurring inpatient treatment facility in September 2018. Benakis testified that she diagnosed B.H. with substance use disorder, severe benzodiazepine use disorder, alcohol use disorder, opioid use disorder, and cannabis use disorder. During their twice-weekly therapy sessions, Benakis attempted to determine the root of B.H.'s trauma causing his substance addiction.

During a September 2018 individual session, B.H. reported to Benakis that he had suffered a panic attack during group therapy when they began discussing sexual trauma. B.H. reported that, when he was a child, he would stay at a friend's house and that this friend's father acted like a father figure to B.H. until B.H. turned 12 years old. B.H. reported that he believed that the abuser was "grooming" him until he reached the age of 12. After B.H. turned 12, B.H. reported that his friend's father would supply him with drugs and alcohol and "would do stuff to me" at least once or twice per week. Benakis testified that during that session, B.H. did not go into specifics but indicated that the "stuff" was sexual in nature. B.H. reported that the abuse continued until 2 weeks prior to B.H. entering treatment. Benakis testified that B.H. did not initially identify his abuser, which indicated that he felt close to the individual and did not want to make any reports against him at that time.

### (iii) Testimony From James Fortner

James Fortner testified that he met B.H. through Danon's son, Joshua, when they were both in eighth grade. Fortner testified that during his freshman year in 2008, he and B.H. spent the night at Danon's house. He testified that B.H. asked Danon to make them some mixed drinks. He testified that he remembered the drinks were "super fizzy." Although he stated he only had one drink, he testified that B.H. had made himself a few other drinks and that B.H. was "highly intoxicated." Fortner testified that eventually he and B.H. went to sleep in Danon's daughter's room. Fortner testified that when B.H. hit the bed, he passed out. Fortner testified that he had trouble falling asleep and sometime during the night, he heard Danon enter the room. During this time, Fortner testified that he pretended to be asleep. He testified that he observed Danon "sort of leaning on the bed, if not crawling on the bed" and then "unbuttoning [B.H.'s] pants." Fortner testified that "my only reaction was I saw him go to pull down the pants and rolled over and slapped [B.H.] in the face" in order to wake him up. Fortner stated that after B.H. woke up, B.H. yelled at Danon and "open hand slapped [Danon] across the face." Fortner testified that he and B.H. stayed another hour to try and sober up B.H. and then left to go to a friend's house. Fortner stated that although he told several friends, he did not otherwise report the incident.

### (b) Evidence Related to A.M.

A.M. testified that, when he was 11 or 12 years old, he became friends with Danon's son. After becoming friends with Danon's son, he and two other friends would spend overnights at Danon's home. According to A.M., the teens fell asleep around the television and he woke up when he heard Danon coming down the stairs. A.M. testified that Danon unbuttoned A.M.'s pants and Danon used his hands and mouth to "[play] with my penis and testicles for a while" and performed fellatio on him.

A.M. testified that Danon provided him with marijuana and alcohol on numerous occasions. A.M. testified that one night, when he was about 12 years old, he and some friends were in a hot tub at Danon's home when Danon used his leg and his foot to press on A.M.'s genitals.

A.M. testified that when he was 15 or 16 years old, Danon attempted to penetrate his anus with his finger and penis but that "I didn't really let him ever." A.M. testified that Danon's finger went into his anus far enough to cause pain.

A.M. testified that he continued going over to Danon's home and, at age 16 or 17, he started hanging out with Danon alone. A.M. testified that Danon began paying him to allow Danon to "jerk [A.M.] off" and that Danon would use A.M.'s hand to "jerk" himself off. Around this same time, Danon began supplying him with prescription medications including Xanax, Lorazepam, Ambien, and sometimes pain pills.

A.M. testified that, in July 2020, after learning of B.H.'s death, he pressed Danon for money in exchange for his silence. Danon paid him $2,000 in exchange for A.M. signing a paper that he and Danon had a consensual sexual relationship after age 18. A.M. testified that, despite this agreement and receiving the money from Danon, he reported the abuse. Bank records established that a $2,000 check was written to A.M. from Danon's account.

(c) Evidence Related to C.M.

C.M. testified that he met B.H. in third grade, and through B.H., he met Danon's son and Danon. C.M. testified that he was approximately 11 years old when he first met Danon. C.M. testified that between the ages of 11 years and 15 to 16 years, he went to Danon's house approximately 100 times. C.M. testified that the first time Danon touched him in a way that made him feel uncomfortable, he was 11 years old. He stated that he, B.H., and J.N. were staying overnight at Danon's house so they could "get fucked up and just use weed and drugs and alcohol and party." C.M. testified that Danon provided them with alcohol, beer, and prescription medications including Valium, Xanax, Oxycontin, and "Roxys." C.M. testified that Danon used his hands the first time that Danon touched his penis and that Danon continued to touch him during subsequent visits to Danon's home. C.M. testified that Danon touched his penis with his mouth, Danon made C.M. use his mouth and hands to touch Danon's penis, and Danon engaged in penile-anal intercourse with C.M. C.M. testified that he was either 12 or 13 years old when Danon first engaged in penile-anal intercourse with him and, on those occasions, Danon paid C.M. more money.

C.M. also testified that he witnessed Danon touching A.M.'s penis with his mouth and touching B.H. and J.N.'s penises with his hands. C.M. testified that he continued going to Danon's home because "I needed money, and I was scared and I didn't know what else to do besides just keep going along with it. Same with all of us."

(d) Evidence Regarding M.H.

M.H. testified that, when he was 15 years old, he met Danon online through a phone application that he described as a social media page that operated like a dating website. M.H. testified that he began using the "chat rooms to speak with men in a sexual nature." During one such chat, M.H. began communicating and eventually exchanged phone numbers with Danon. One evening, when M.H. was 16 years old, while at Danon's house, Danon provided M.H. with alcohol and they got into Danon's hot tub unclothed. While in the hot tub, Danon used his hands, feet, and mouth to touch M.H.'s penis and M.H. touched Danon's penis with his mouth. M.H. testified that he continued to have contact with Danon until Danon was arrested in June 2021. During that time period, Danon provided M.H. with alcohol, marijuana, and prescription medications. Additionally, Danon provided M.H. with money in exchange for sexual encounters.

M.H. also testified that, on one occasion, when he was a high school sophomore, Danon picked him up early from school and they returned to Danon's house. M.H. testified that "we were hanging out as usual. He offered me a pill for my anxiety because I'm really freaking out. We're drinking. And then we go to lay down in his bed to cuddle and I passed out." M.H. testified that he did not remember falling asleep but that he woke up to Danon sexually assaulting him. M.H. testified that he was "feeling a considerable amount of pain. [Danon] was inside me. I hadn't been fucked before . . ." M.H. testified that the pain was from Danon putting his penis inside M.H.'s anus. M.H. testified that Danon "was telling me to relax." M.H. testified that he had never engaged in penile-anal intercourse but that Danon had previously attempted to penetrate M.H.'s anus with his fingers and M.H. responded "fuck no. You're not doing that." M.H. testified that he left Danon's home shortly after, but he remembered that it hurt for the next 3 days and he had blood when he went to the bathroom.

M.H. testified that he defined his relationship with Danon as a dating relationship and that he looked up to Danon as a role model. M.H. testified that, when he was 16 or 17 years old, he began to feel like something was off with his relationship with Danon. M.H. testified that he let himself into Danon's house and found Danon naked in the bed with B.H.

(e) Evidence Regarding M.S.

M.S. testified that, when he was 14 years old, he met Danon on a dating app called "Grinder." M.S. testified that he lied about his birthdate to sign up for Grinder because it required users to be at least 18. M.S. testified that during a conversation with Danon on the app, M.S. stated that he was only 14 or 15 years old and Danon stated that he was in his 40's. M.S. testified that after they began talking about alcohol, Danon indicated that he would purchase alcohol for M.S. After communicating on Grinder for about a month, he and Danon met in person. According to M.S., during this initial meeting, Danon provided him with alcohol and a little blue pill which Danon said "would make him feel good." M.S. later determined that the pill was Xanax to which he eventually developed an addiction.

M.S. testified that thereafter Danon touched M.S.'s penis using his hands and mouth and M.S. used his mouth to touch Danon's penis. M.S. testified that he and Danon continued to have contact approximately once or twice per week during which they engaged in oral sex. M.S. testified that although he did not want anything sexual to happen, Danon penetrated his anus with his fingers.

M.S. testified that, on another occasion when M.S. was 15 years old, Danon gave him alcohol and prescription pills, then ripped off M.S.'s clothes and began penetrating M.S.'s anus with his penis. M.S. testified that even though he told Danon "no" multiple times, Danon assured him that "It'll be alright. You'll get used to it." M.S. testified that Danon gave him between $60 to $80 after each encounter.

(f) Evidence Related to G.C.

G.C. testified that, during one of the overnights he and B.H. spent at Danon's house, Danon gave them food and drinks and, after he fell asleep, the next thing he remembered was "waking up to being sexually assaulted." G.C. testified that he did not remember falling asleep and felt that he had been drugged.

## (g) Evidence Adduced in Danon's Defense

### (i) Joshua Danon

Danon's son, Joshua Danon, testified on Danon's behalf. Joshua testified that his parents divorced when he was 7 or 8 years old and although there was a split custody arrangement, he and his sister primarily lived with their mother. Joshua testified that initially they would see Danon on Wednesday evenings and every other weekend. Joshua testified that he stopped spending the night when he was a freshman in high school due to Danon's anger issues.

Joshua testified that he and B.H. met as young children and became best friends. Joshua testified that B.H. regularly stayed overnight at Danon's home until Joshua stopped spending overnights at Danon's home. Joshua stated that although he was aware that B.H. continued spending time at Danon's house, he was not aware that B.H. continued to spend overnights when Joshua was not there. Joshua testified that he knew B.H. was spending time at Danon's house because B.H's vehicle was parked there. Joshua also testified that there were times he saw A.M.'s vehicle parked outside of Danon's house.

Joshua testified that he never saw Danon sexually assault B.H., but before B.H. passed away, B.H. told him about the relationship he had with Danon. Joshua testified that B.H. described the relationship with Danon as a loving relationship.

Joshua further testified that, when he was growing up, he never saw Danon give any young men alcohol or marijuana or commit sexual assault. However, Joshua testified that Danon would "turn the other way" when he and his friends drank or smoked marijuana at Danon's house. Joshua further admitted that, when he was in junior high school, there were rumors circulating about Danon. Joshua testified that he was aware Danon had been prescribed prescription medications for anxiety and sleeping for about 20 years and that he kept the medications in the master bedroom medicine closet.

### (ii) Sherrill Berendse

Sherrill Berendse testified that she rented Danon's basement from September 2009 to December 2020. Berendse testified that, during that time, she worked full time Monday through Friday from 8 a.m. to either 4 p.m. or 5 p.m. She stated that although she did not work weekends, there were some weekends that she was out of town or with a friend or family member. Berendse testified that during the time she was renting the basement, there were always kids upstairs, who she believed were Joshua's friends, at least 5 days per week, and they were present even when Joshua was not there. Berendse testified that she never saw anything inappropriate, but that she observed Danon and some of the boys in the hot tub several times.

### (iii) Pavel Kuzma

Pavel Kuzma testified that he rented from Danon from 2018 until Danon's arrest in June 2021. Kuzma testified that he worked two jobs and that he went straight from his first job which started at 10 a.m. to his second job. Kuzma testified that, during that time, he never saw any of the victims spend overnights at Danon's house.

#### 4. Jury Verdicts and Sentencing

Following the trial, the jury found Danon guilty on all charges involving victims B.H., A.M., C.M., M.S., and M.H. The jury found Danon not guilty of first degree sexual assault involving victim G.C.

The district court sentenced him to an aggregate 145 to 175 years of imprisonment. The court ordered the sentences specific to each victim to run concurrently to each other but ordered each set of sentences to run consecutively to the set of sentences for the other victims. Danon was given credit for 603 days served. Danon has timely appealed to this court and is represented by new counsel.

## III. ASSIGNMENTS OF ERROR

Danon's assignments of error, renumbered and restated, are that: (1) the court erred in sustaining the State's motion to consolidate and denying his request to sever; (2) his right to confrontation was violated by the court's application of the rape shield statute; (3) the court erred in admitting into evidence medical records that were inadmissible hearsay and violated his right to confrontation; (4) the evidence was insufficient to support his convictions; (5) the sentences imposed were excessive; and (6) his trial counsel was ineffective in failing to file pretrial motions related to the Cellebrite report of google searches obtained from Danon's phone.

## IV. STANDARD OF REVIEW

In reviewing a criminal conviction for the sufficiency of the evidence, an appellate court determines whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Bryant*, 311 Neb. 206, 971 N.W.2d 146 (2022).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *Id.*

A trial court's denial of a motion to sever will not be disturbed on appeal absent an abuse of discretion. *State v. Benson*, 305 Neb. 949, 943 N.W.2d 426 (2020).

A sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. *State v. Lara*, 315 Neb. 856, 2 N.W.3d 1 (2024).

Whether a claim of ineffective assistance of counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. *State v. Npimnee*, 316 Neb. 1, 2 N.W.3d 620 (2024). In reviewing a claim of ineffective assistance of counsel on direct appeal, an appellate court determines as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance. *Id.*

## V. ANALYSIS

### 1. CONSOLIDATION OF CASES

Danon assigns that the district court erred in sustaining the State's motion to consolidate and in denying his request to sever. He argues that the cases were not of the same or similar character, were not based on the same act or transaction, did not constitute parts of a common scheme or plan, and that consolidating the charges resulted in undue prejudice.

In *State v. Benson*, 305 Neb. 949, 972-73, 943 N.W.2d 426, 444-45 (2020), the Nebraska Supreme Court stated:

> There is no constitutional right to a separate trial. Instead, the joinder or separation of charges for trial is governed by § 29-2002, which states, in relevant part:
>
> > (1) Two or more offenses may be charged in the same indictment, information, or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
> >
> > . . . .
> >
> > (3) If it appears that a defendant or the state would be prejudiced by a joinder of offenses in an indictment, information, or complaint . . . the court may order an election for separate trials of counts, indictments, informations, or complaints, grant a severance of defendants, or provide whatever other relief justice requires.
>
> Summarized, whether offenses were properly joined involves a two-stage analysis: (1) whether the offenses were sufficiently related to be joinable and (2) whether the joinder was prejudicial to the defendant. There is a strong presumption against severing properly joined counts.
>
> While § 29-2002 presents two separate questions, there is no error under either subsection (1) or (3) if joinder was not prejudicial, and a denial of a motion to sever will be reversed only if clear prejudice and an abuse of discretion are shown. An appellate court will find such an abuse only where the denial caused the defendant substantial prejudice amounting to a miscarriage of justice.
>
> A defendant appealing the denial of a motion to sever has the burden to show compelling, specific, and actual prejudice. Severe prejudice occurs when a defendant is deprived of an appreciable chance for an acquittal, a chance that the defendant would have had in a severed trial.

Danon first contends that that the offenses were not sufficiently related to be joinable. In support of that contention, he argues that "[t]here is little to no overlap in the evidence supporting the separate charges." Brief for appellant at 44. We disagree. Under our case law, to determine whether the charges joined for trial are of the same or similar character, we look at the underlying factual allegations. *State v. Knutson*, 288 Neb. 823, 852 N.W.2d 307 (2014).

Here, Danon was charged with one count of first degree sexual assault of a child, eight counts of first degree sexual assault, and eight counts of third degree sexual assault of a child. The

charges involved seven victims over a period of 12 years. Based on the factual allegations, the victims were of similar ages when the sexual abuse occurred, and with the exception of the two victims who testified that they met Danon online, the victims were all part of the same friend group, with each victim testifying that Danon provided them with alcohol, drugs, and money in exchange for the sexual contact. We find that the charges joined were "of the same or similar character" and were joinable under § 29-2002(1).

Danon next argues that joinder resulted in substantial prejudice to him and was a miscarriage of justice. When considering whether the otherwise proper joinder prejudiced Danon, absent a showing of substantial prejudice, spillover of evidence from one count to another does not require severance. See *State v. Knutson, supra*. A defendant opposing joinder of charges has the burden of proving prejudice. *State v. Briggs*, 303 Neb. 352, 929 N.W.2d 65 (2019). To carry that burden, a defendant must show compelling, specific, and actual prejudice from the court's refusal to grant the motion to sever. *Id*. Severe prejudice occurs when a defendant is deprived of an appreciable chance for an acquittal, a chance that the defendant would have had in a severed trial. *Id*.

Danon argues that the evidence of one charge would not have been admissible in the trial of the others and that there was a substantial risk of juror confusion of the issues since each charge was alleged to have occurred during a multi-year period of time. He asserts that by defending the charges together, he was deprived of an appreciable chance at acquittal due to the intermingling of the issues and the likelihood that the jury considered the cumulative effect of the evidence. We disagree.

The Nebraska Supreme Court's opinion in *State v. Knutson*, 288 Neb. 823, 852 N.W.2d 307 (2014), similarly involved the joinder of trials involving multiple young victims of sexual assault. Following an order allowing the joinder of the trials, the defendant made similar claims suggesting the evidence of the separate sexual assault charges would not have been admissible in the other trials and that trying the charges together would result in juror confusion. In quoting from the Eighth Circuit Court of Appeals, the Nebraska Supreme Court stated:

> The Eighth Circuit has stated that "'[s]evere prejudice occurs when a defendant is deprived of an *appreciable* chance for an acquittal, a chance that [the defendant] would have had in a severed trial.'" But it also applies a "'strong presumption against severing properly joined counts.'" As we have previously held, prejudice is not shown if evidence of one charge would have been admissible in a separate trial of another charge. Additionally, federal courts hold that prejudice usually does not occur from joined charges if the evidence is sufficiently simple and distinct for the jury to easily separate evidence of the charges during deliberations. This is particularly true when the trial court specifically instructed the jury to separately consider the evidence for each offense. We agree with this reasoning and have previously applied it.

*State v. Knutson*, 288 Neb. at 833-34, 852 N.W.2d at 318 (emphasis in original).

Applying that rationale, the Nebraska Supreme Court held:

> Here, we need not consider whether the evidence of each charge would have been admissible in separate trials. The evidence supporting each charge was simple and distinct from the evidence of other offenses. In other words, the jury could separate the charges and

associated evidence, without combining evidence of other charges to find guilt on a charge that it would not have found if the court had ordered separate trials. Moreover, the judge specifically instructed the jury that it was to keep the charges separate and come to a separate decision regarding each charge. Absent evidence to the contrary, a jury is presumed to follow its instructions. But most important, here there is more than simply a presumption that the jury followed its instructions; the record shows that it actually did do so. The jury found [the defendant] guilty of the charges involving E.A. but acquitted him of the charges involving the other three girls. Because the jury's verdicts show that it actually separated the evidence and offenses, [the defendant] has not shown prejudice from the joinder.

*State v. Knutson*, 288 Neb. at 834, 852 N.W.2d at 318.

We reach a similar finding here. Danon cannot show he was prejudiced from the joinder of the charges. The court separately instructed the jury to apply the elements of each charge for each individual victim and instructed the jury that it must separately come to a decision regarding each crime. The jury in this case found that Danon was not guilty as it related to the allegations against G.C. but found that he was guilty as it related to the other victims. From this record, it is apparent that the jury was able to separately consider each charge. Therefore, we find that the district court did not abuse its discretion in granting the State's motion to consolidate and in denying Danon's motion to sever the charges.

## 2. NEBRASKA'S RAPE SHIELD LAW

Danon next contends that the district court erred in determining that his right to confrontation was not violated when the district court prohibited him from presenting evidence of the victims' past sexual experiences under Nebraska's Rape Shield Statute codified at § 27-412. Danon argues that his inability to present this evidence violated his constitutional right to confrontation. He argues that the district court erred in determining that evidence of the victims' past sexual interactions had no bearing on whether Danon sexually assaulted them and that "the State clearly and obviously opened the door to such information when presenting its grooming theory." Brief for appellant at 34. He further contends that "because the homosexual tendencies of the victims, prior to such experiences with [Danon], creates a reasonably inferable presumption that the victims were not groomed by [Danon]; ultimately lessening and potentially eliminating the State's theory." Brief for appellant at 34-35.

Section 27-412 provides that evidence is inadmissible if offered to prove that a victim engaged in other sexual behavior or if it is offered to prove a victim's sexual predisposition. However, exceptions to the rule include offering evidence of other sexual behavior by the victim to prove someone else was the source of the semen, injury or other physical evidence, if offered by the defendant to prove consent by the victim, and evidence whose exclusion would violate the defendant's constitutional rights.

The rule here specifically precludes the admission of the victims' prior sexual conduct or the victims' sexual predisposition except under certain circumstances. Danon does not assert that someone else was the source of any physical evidence nor does he argue the consent exception applies. Instead, he argues that by refusing to allow evidence of the victims' sexual predisposition,

the court violated his right to present a complete defense and his constitutional right to confront his accusers.

In analyzing Nebraska's Rape Shield Law originally codified at § 28-321, the Nebraska Supreme Court stated:

> The Nebraska Legislature operated well within its prerogative in enacting § 28-321, excluding irrelevant details of the victims' sexual histories from evidence in sexual assault trials. The exclusion of this evidence does not prevent defendants from presenting relevant evidence in their own defense. "It merely denies defendant the opportunity to harass and humiliate the complainant at trial and divert the attention of the jury to issues not relevant to the controversy." *People v. Cornes, supra* 80 Ill. App. 3d at 175, 399 N.E.2d at 1353. A defendant has no constitutional right to inquire into irrelevant matters. *Pratt v. Parratt*, 615 F.2d 486 (8th Cir. 1980).

*State v. Schenck*, 222 Neb. 523, 529, 384 N.W.2d 642, 647 (1986).

Although Nebraska's Rape Shield Law was repealed and a new Rape Shield Law was enacted at § 27-412, the new statute follows a similar pattern to § 28-321. Here, Danon was charged with multiple counts of sexual assault involving children who, by law, could not consent to such conduct. As such, evidence of their sexual predispositions was irrelevant to the offenses charged.

Accordingly, we agree with the district court that the exclusion of the victims' sexual interactions was in accord with the primary purposes of Nebraska's rape shield statute of avoiding harassment of alleged victims and diverting the jury's attention to irrelevant matters, and we reject Danon's claim that the court's preclusion of Danon from questioning the victims about their past sexual experiences resulted in a denial of his right to confrontation or deprived him of his right to present his defense. This assignment of error fails.

### 3. B.H.'S STATEMENTS TO THERAPIST

Danon next assigns that the district court erred in admitting into evidence statements made by B.H. to his therapist. Danon argues that statements contained in B.H.'s therapy records identifying Danon as B.H.'s abuser are testimonial, are hearsay, and violate his right to confrontation.

Section 27-803 provides, in pertinent part, that:

> Subject to the provisions of section 27-403, the following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (4) Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment[.]

The Nebraska Supreme Court has explained that, in order for testimony to be admissible under the medical diagnosis or treatment exception to the hearsay rule,

> the evidence must satisfactorily demonstrate that the circumstances under which the statement was made were such that the declarant's purpose in making the statement was to

assist in the provision of medical diagnosis or treatment, that the declarant's statement was reasonably pertinent to such diagnosis or treatment and, further, that a doctor would reasonably rely on such statement.

*State v. Vaught*, 268 Neb. 316, 322, 682 N.W.2d 284, 289 (2004).

Statements admissible under § 27-803(4) need not be made to a physician. See *State v. Herrera*, 289 Neb. 575, 856 N.W.2d 310 (2014) (referencing current language contained in § 27-803(4) which was previously found at Neb. Rev. Stat. § 27-803(3) (Reissue 2008). A child's statements to a therapist describing sexual abuse have been found admissible under this rule. *State v. Herrera, supra*. The statement need not be solely for the purpose of medical diagnosis or treatment; a statement gathered for dual medical and investigatory purposes can be admissible under § 27-803(4). See *State v. Herrera, supra*. The question is whether the statement was made in legitimate and reasonable contemplation of medical diagnosis or treatment. *Id*. Whether a statement was taken and given in contemplation of medical diagnosis or treatment is a factual finding by the trial court, and we review that determination for clear error. *Id*.

However, a hearsay statement can still be inadmissible if it is found to violate a defendant's right to confrontation. *State v. Vaught*, 268 Neb. 316, 682 N.W.2d 284 (2004). In *Vaught*, the Nebraska Supreme Court in applying the ruling laid out by the United States Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), stated:

> The Confrontation Clause, U.S. Const. amend. VI, provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." Neb. Const. art. I, § 11, provides, in relevant part: "In all criminal prosecutions the accused shall have the right . . . to meet the witnesses against him face to face . . . ." We have held that the analysis under article I, § 11, is the same as that under the Sixth Amendment to the U.S. Constitution. . . .
>
> . . . .
>
> . . . In *Crawford*, the U.S. Supreme Court held that where "testimonial" statements are at issue, the Confrontation Clause demands that such hearsay statements be admitted at trial only if the declarant is unavailable and there had been a prior opportunity for cross-examination. 541 U.S. at 68.

*State v. Vaught*, 268 Neb. at 323-24, 682 N.W.2d at 290. However, as the Nebraska Supreme Court clarified in *Vaught*, statements made for the purpose of medical diagnosis and treatment do not fall within the testimonial category of *Crawford* if the statements are truly given for medical, as opposed to prosecutorial purposes.

Here, the record indicates that at the time that B.H. made the statements to his therapist, he was receiving dual-diagnostic treatment for drug addiction and mental health. B.H.'s treatment goals included establishing appropriate boundaries with Danon by ceasing contact with him, and as part of this treatment, B.H. and his therapist called Danon during a session to confront him and establish those boundaries. Because the record indicates that B.H.'s statements during the course of his therapy were made in legitimate and reasonable contemplation of receiving medical diagnosis and treatment, not prosecutorial purposes, we find that the district court did not clearly

err in making those factual findings and subsequently admitting B.H.'s therapy records into evidence pursuant to § 27-803(4).

Danon separately argues that, even if admissible under § 27-803(4), portions of B.H.'s statements identifying Danon as the assailant should be redacted because those portions of B.H.'s statements were not necessary to medically or psychologically diagnose or treat him. But as the Nebraska Supreme Court noted in *State v. Vigil*, 283 Neb. 129, 141, 810 N.W.2d 687, 698 (2012):

> While statements relating to fault are generally not admissible under rule 803(3), when a child is sexually abused, and especially when the child has a familial relationship with the child's abuser, the identity of the perpetrator is reasonably pertinent to diagnosis and treatment, because the victim cannot be effectively treated if sent right back into the abuser's clutches.

Here, as stated above, B.H.'s statements during therapy were obtained to assist Benakis in establishing boundaries as part of B.H.'s treatment plan. Benakis further described that part of B.H.'s treatment was for him to disclose his abuse to his parents, that disclosure was an important step in B.H.'s treatment, and that disclosure would allow B.H.'s parents to provide oversight to B.H. and help him enforce boundaries with Danon. We find that the district court did not err in admitting the records without redacting Danon's identity.

### 4. SUFFICIENCY OF EVIDENCE

Danon next assigns that the district court erred in finding that the evidence was sufficient to support his convictions as "the evidence failed to establish penetration and/or sexual contact and failed to provide a sufficient nexus to the alleged dates of contact." Brief for appellant at 7. He further contends that

> [t]he evidentiary deficiencies are not an issue of mere witness credibility, but, rather, the absence of evidence presented by the State to support a finding beyond a reasonable doubt. The absence of physical evidence and the testimony adduced at trial does not support a finding of guilt beyond a reasonable doubt . . . .

Brief for appellant at 31.

The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. *State v. Bryant*, 311 Neb. 206, 971 N.W.2d 146 (2022).

Here, Danon was convicted of first degree sexual assault, third degree sexual assault of a child, and first degree sexual assault of a child. First degree sexual assault is defined in Neb. Rev. Stat. § 28-319 (Reissue 2016) which provides, in relevant part:

> (1) Any person who subjects another person to sexual penetration (a) without the consent of the victim, (b) who knew or should have known that the victim was mentally or physically incapable of resisting or appraising the nature of his or her conduct, or (c) when the actor is nineteen years of age or older and the victim is at least twelve but less than sixteen years of age is guilty of sexual assault in the first degree.

- 14 -

Nebraska's statute defining second and third degree sexual assault of a child is found at Neb. Rev. Stat. § 28-320.01(Reissue 2016) which provides, in part, that "(1) A person commits sexual assault of a child in the second or third degree if he or she subjects another person fourteen years of age or younger to sexual contact and the actor is at least nineteen years of age or older."

The offense of first degree sexual assault of a child is codified at Neb. Rev. Stat. § 28-319.01(1)(b) (Reissue 2106), which provides in relevant part, that a person commits first degree sexual assault of a child "[w]hen he or she subjects another person who is at least twelve years of age but less than sixteen years of age to sexual penetration and the actor is twenty-five years of age or older."

Neb. Rev. Stat. § 28-318 (Cum. Supp. 2020) defines both sexual contact and sexual penetration as:

> (5) Sexual contact means the intentional touching of the victim's sexual or intimate parts or the intentional touching of the victim's clothing covering the immediate area of the victim's sexual or intimate parts. Sexual contact also means the touching by the victim of the actor's sexual or intimate parts or the clothing covering the immediate area of the actor's sexual or intimate parts when such touching is intentionally caused by the actor. Sexual contact includes only such conduct which can be reasonably construed as being for the purpose of sexual arousal or gratification of either party. Sexual contact also includes the touching of a child with the actor's sexual or intimate parts on any part of the child's body for purposes of sexual abuse by a school employee under section 28-316.01 or sexual assault of a child under sections 28-319.01 and 28-320.01;

> (6) Sexual penetration means sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical, nonhealth, or nonlaw enforcement purposes. Sexual penetration shall not require emission of semen.

We note that the evidence established that Danon was born in November 1955.

### (a) B.H.

Danon was convicted of four counts related to B.H.--two counts of first degree sexual assault under § 28-319 and two counts of third degree sexual assault of a child under § 28-320.01. Danon contends that the State failed to establish sufficient evidence of the identity of the alleged perpetrator of the abuse of B.H. especially regarding the allegations of anal intercourse; sexual penetration or sexual contact; B.H.'s age; the venue; and the date of the alleged incident or incidents.

Here, B.H.'s therapist testified that, after B.H. experienced a panic attack in a group therapy session while discussing sexual trauma, B.H. reported that when he was 7 years old, his best friend's father was like a "father figure" to him, "built up my trust, and he was very kind to me." B.H. told his therapist that he thought he was being "groomed" by the friend's father. B.H. reported that, after he turned 12, "he started supplying me with drugs and alcohol, and then he would do stuff to me." B.H.'s therapist testified that although B.H. did not disclose specifics at that time, the

"stuff" was sexual in nature and the abuse occurred once or twice per week from the time when he was 12 years old until 2 weeks prior to him entering the facility. B.H. indicated to his therapist that he remembered one specific occasion where his abuser gave him Xanax to help him sleep and he remembered waking up to being touched inappropriately. During his initial disclosure, B.H. reported feeling close to his abuser and indicated that he did not want to make any reports at that time.

During later sessions, B.H. disclosed that the name of his abuser was "Steve" and, during one session, B.H. called "Steve" to end the relationship. During sessions, the therapist testified that B.H. disclosed that "Steve" performed oral sex on B.H, and during a group therapy session, B.H. reported sexual abuse by "best friend's father Steve" including "oral and anal activity."

During a family session with B.H. and his mother, B.H. disclosed that "Steve" would drug him with Ambien or Xanax until B.H. passed out, then would sexually assault him. After the disclosure, but still during the family session, B.H.'s mother called Danon and told him "I am sitting here with [B.H.] and he's told me everything, and you stay the fuck away from my son and have no more contact with him." B.H.'s mother testified that B.H. and Joshua Danon were best friends growing up and that, starting when B.H. was 6 or 7 years old, he would regularly spend overnights at Danon's house which was located in Douglas County.

Therapy notes, which were admitted into evidence, indicated that B.H. stated that he felt closer to "Josh and Steve as family than his parents" when he was growing up; that he frequently stayed overnight at their house; that his friend's father sexually abused him for 11 years; and that B.H. felt loyal to his abuser who he identified as "Steve." The note indicated that B.H. had characteristics of Stockholm Syndrome and a trauma bond with his abuser.

Despite Danon's argument that the evidence failed to establish the identity of B.H.'s abuser, the evidence established beyond a reasonable doubt that B.H. disclosed in treatment his abuser's name was "Steve" and that he was the father of his best friend "Josh." B.H.'s mother identified "Steve" as Danon. This established the identity of Danon as the perpetrator of the abuse of B.H. And despite Danon's argument that the evidence failed to establish venue, the evidence established that the abuse occurred at Danon's house, which was located in Douglas County.

Regarding Danon's claim that the evidence failed to establish penetration and/or sexual contact or the dates of the offenses, B.H. reported during therapy that, starting at age 12, he was subjected to weekly sexual abuse by "Steve" which included "oral and anal activity" and included being touched inappropriately. Finally, regarding Danon's claim that the evidence failed to establish the victim's age, the evidence established that the abuse started at age 12 and continued until 2 weeks prior to him entering the treatment facility.

Viewing the evidence in the light most favorable to the State, we find that the evidence supported Danon's convictions of first degree sexual assault and third degree sexual assault of a child, including establishing Danon's identity as the perpetrator of the abuse of B.H.; sexual penetration and/or sexual contact; B.H.'s age; the venue; and the dates of the alleged incidents. This assignment of error fails.

### (b) A.M.

Danon was convicted of four counts related to A.M.--two counts of first degree sexual assault and two counts of third degree sexual assault of a child. He contends that, although "the

State attempted to establish two incidents of penetration [related to A.M.], the testimony elicited was flimsy." Brief for appellant at 26. He also contends that there was no evidence establishing the dates of the offenses or venue.

Regarding Danon's two convictions for third degree sexual assault of a child, the evidence adduced proved beyond a reasonable doubt that Danon committed those offenses. A.M. testified that his first overnight visit at Danon's home occurred when A.M. was 11 years old and, during that visit, Danon unbuttoned A.M.'s pants and used his hands and mouth to touch A.M.'s penis. A.M. also testified that the second incident, the "hot tub" incident, occurred when he was 12 years old. During that incident, Danon provided marijuana to A.M. after which they got into Danon's hot tub located at Danon's home. While in the hot tub, Danon used his leg and foot to press on A.M.'s penis. Thus, the evidence established that Danon, who was over 19 years old, subjected A.M., who was younger than 14 years old, to sexual contact on two occasions and that these incidents occurred at Danon's home which is located within Douglas County.

Regarding his convictions of first degree sexual assault, Danon contends that the State failed to produce evidence of penetration, the dates of any alleged penetration, or venue. We disagree. A.M. testified that, during his first overnight visit at Danon's house, which occurred when he was 11 years old, Danon performed fellatio on him. And, when A.M. was 15 or 16 years old, Danon penetrated his anus with his finger far enough to cause pain.

The evidence established that these sexual assaults occurred at Danon's house, which was located in Douglas County, Nebraska. Accordingly, we find that the evidence refutes Danon's argument that the evidence was insufficient to prove penetration, dates, or venue. This assignment of error fails.

(c) C.M.

Danon was convicted of four counts related to C.M.--two counts of first degree sexual assault and two counts of third degree sexual assault of a child. He contends that the State failed to establish sufficient evidence of sexual contact or sexual penetration regarding C.M.

C.M. testified that he first met Danon when he was 11 years old and that, between the ages of 11 and 15 or 16, he visited Danon's house approximately 100 times. C.M. testified that the first time Danon touched him in a way that made him uncomfortable was when he was 11 years old. C.M. testified that Danon provided alcohol, marijuana, and pills to him and two other boys. After the boys fell asleep during the overnight visit, Danon used his hands to touch C.M.'s penis. C.M. testified that "[Danon] was just, like, jacking it off. Like, messing with it." C.M. testified that between five and ten times during visits when he and Danon were in Danon's hot tub, Danon would touch C.M.'s penis with his hands. C.M. testified to another incident when he was either 11 or 12 years old where Danon touched his penis and put C.M.'s penis in his mouth for the first time. C.M. testified that Danon used his mouth to touch C.M.'s penis between 30 to 50 times.

Regarding penetration, C.M. testified that Danon anally penetrated him the first time when he was about 12 or 13 years old. C.M. testified that Danon made "me touch his penis and. . . then he would suck my penis, and I would jack him off and then he would have sex with me" which involved Danon engaging in penile-anal intercourse with C.M. C.M. testified that Danon penetrated his anus approximately 10 times and that it always occurred at Danon's home. C.M. further testified that Danon paid him more money on the occasions when Danon would penetrate

his anus. C.M. testified that the last time Danon penetrated his anus was when he was 14 or 15 years old.

Although Danon argues that the evidence was insufficient to find that there had been penetration or sexual contact, when a defendant is charged with first degree sexual assault, the issue is not whether the defendant had sexual intercourse with the victim; rather, the issue is whether the defendant achieved even the slightest penetration. *State v. Faatz*, 234 Neb. 796, 452 N.W.2d 751 (1990). Because the C.M.'s testimony indicated that Danon penetrated his anus on 10 occasions between the time that C.M. was 11 years old and 15 years old, viewing the evidence in the light most favorable to the State, the evidence was sufficient to support Danon's convictions of first degree sexual assault and third degree sexual assault of a child related to C.M. This assignment of error fails.

### (d) M.S.

Danon was convicted of one count related to M.S.--first degree sexual assault of a child. Danon argues that inconsistencies in M.S.' reporting of the date that the alleged anal penetration occurred combined with M.S.' admitted memory issues "from years of drug abuse," rendered the evidence insufficient to support his conviction. Brief for appellant at 29. However, in reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Bershon*, 313 Neb. 153, 983 N.W.2d 490 (2023).

At trial M.S. testified that he met Danon on a dating website when he was 14 years old and maintained contact with Danon until he was 21 or 22 years old. About a month after meeting on the dating website, M.S. and Danon met in person. During this encounter, he and Danon engaged in oral sex. And, when M.S., was 15 years old, during an incident at Danon's home, Danon provided him with alcohol and drugs, then "[Danon] basically just ripped my clothes off, and I laid down, and I just laid there and took it." Danon continued the penile-anal sexual assault of M.S. for approximately 15 to 20 minutes until Danon ejaculated inside of M.S.'s anus. M.S. testified that "it hurt really bad." This evidence, when viewed in the light most favorable to the State, supports Danon's conviction of first degree sexual assault of a child, which required that Danon, who was 25 years of age or older, subjected M.S., who was at least 12 years of age but less than 16 years of age, to sexual penetration. This assignment of error fails.

### (e) M.H.

Danon was convicted of one count related to M.H.--first degree sexual assault under § 28-319(1)(b). He contends that the State failed to establish sufficient evidence that he subjected M.H. to sexual penetration and that he knew of should have known that M.H. was mentally or physically incapable of resisting or appraising the nature of Danon's conduct.

Here, M.H. testified that, after he met Danon through a dating site, they began "hanging out" one to two times per week. They eventually began engaging in oral sex. M.H. testified that on one occasion when he was a high school sophomore, he and Danon were drinking at Danon's house and Danon offered him an anxiety pill, which he took. According to M.H., he and Danon

"went to lay down in [Danon's] bed to cuddle and I passed out." M.H. testified that he did not remember falling asleep but that he woke up to Danon sexually assaulting him. M.H. testified that he was "feeling a considerable amount of pain. [Danon] was inside me. I hadn't been fucked before . . ." M.H. testified that the pain was from Danon putting his penis inside M.H.'s anus. M.H. testified that Danon "was telling me to relax." M.H. testified that he had never engaged in penile-anal intercourse, but that Danon had previously attempted to penetrate M.H.'s anus with his fingers and M.H. responded "fuck no. You're not doing that." M.H. testified that it hurt for the next 3 days and he had blood when he went to the bathroom.

The jury heard that Danon gave M.H. a pill and that M.H. passed out shortly thereafter. M.H. testified that he woke up to considerable pain from Danon penetrating his anus. See *State v. Freeman*, 267 Neb. 737, 677 N.W.2d 164 (2004) (evidence was sufficient to find assailant knew or should have known that victim was mentally or physically incapable of resisting or appraising nature of her conduct when she was incapacitated by alcohol and was sexually assaulted while sleeping). This evidence, considered in the light most favorable to the State, was sufficient to support Danon's conviction of first degree sexual assault based upon Danon engaging in penile-anal penetration with M.H. and that Danon knew, or should have known, that M.H. was mentally or physically incapable of resisting or appraising the nature of Danon's conduct. This assignment of error is without merit.

### 5. EXCESSIVE SENTENCES

Danon assigns that the district court erred in imposing excessive sentences arguing that the district court's sentencing decision was "devoid of analysis" and the court's sentencing order was primarily based on the nature of the offenses and failed to adequately account for his experience and other sentencing factors. Brief for appellant at 52.

For each of Danon's seven convictions of first degree sexual assault, all Class II felonies, the district court sentenced him to 30 to 35 years' imprisonment. See § 28-319 (first degree sexual assault). These sentences are within the statutory sentencing range for Class II felonies which are punishable by a minimum of 1 year of imprisonment and a maximum of 50 years' imprisonment. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2022) (classification of felonies; penalties).

For each of Danon's six convictions of third degree sexual assault of a child, all Class IIIA felonies, the district court sentenced him to 2 to 3 years' imprisonment. See § 28-320.01(1) and (3) (third degree sexual assault of a child). These sentences are within the statutory sentencing range for Class IIIA felonies which are punishable by a minimum of no imprisonment and a maximum of 3 years' imprisonment followed by 9 to 18 months' post-release supervision. See § 28-105. The district court properly did not include a sentence of post-release supervision because Danon had also been sentenced for a Class IB felony and seven Class II felonies. See § 28-105(6) (any person sentenced to imprisonment for a Class I, IA, IB, IC, ID, II, or IIA felony and sentenced concurrently or consecutively to imprisonment for a Class III, IIIA, or IV felony shall not be subject to post-release supervision).

For Danon's conviction of first degree sexual assault of a child, a class IB felony, the district court sentenced him to 25 to 35 years' imprisonment with a mandatory minimum sentence of 15 years' imprisonment. See § 28-319.01 (first degree sexual assault of a child). Class IB felonies which normally punishable by a minimum of 20 years' imprisonment to a maximum of

life imprisonment; however, the offense of first degree sexual assault of a child carries a mandatory minimum of 15 years' imprisonment. See, § 28-105; § 28-319.01(2). See *State v. Russell*, 291 Neb. 33, 863 N.W.2d 813 (2015) (range of penalties for first degree sexual assault of a child, first offense, under § 28-319.01(2), is 15 years' to life imprisonment).

Having determined that the sentences imposed by the court were within the applicable statutory sentencing ranges, we proceed to consider Danon's argument challenging the district court's consideration of factors supporting his sentence. Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors, as well as any applicable legal principles in determining the sentence to be imposed. *State v. Lara*, 315 Neb. 856, 2 N.W.3d 1 (2024). When imposing a sentence, the sentencing court is to consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *Id*. The appropriateness of a sentence is necessarily a subjective judgment that includes the sentencing judge's observations of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

During the sentencing hearing, the district court stated that it had considered the presentence investigation report and the appropriate sentencing factors as defined in Neb. Rev. Stat. § 29-2260 (Reissue 2016). And despite Danon's claim that the district court's sentencing decision was "devoid of analysis," a sentencing court is not required to articulate on the record that it has considered each sentencing factor nor to make specific findings as to the facts pertaining to the factors or the weight given them. *State v. Greer*, 309 Neb. 667, 962 N.W.2d 217 (2021).

At the time of the presentence investigation report, Danon was 67 years old, divorced, had no dependents, and had obtained a bachelor's degree. Danon's criminal history included convictions for burglary, third degree domestic assault, and criminal mischief. The level of service/case management inventory (LS/CMI) assessed Danon as a high risk to reoffend and Danon's combined scores on the Vermont Assessment for Sex Offender Risk II VASOR II) and the Sex Offender Risk Intervention and Progress Scale (SOTIPS) assessed him as a moderate to high risk to reoffend. The probation officer completing the PSR also noted that Danon "rationalizes his behavior and up until his arrest was unwilling to change." During his interview with probation, Danon mentioned that he had done terrible things and admitted to having issues with his sexual interests and his choice of sexual partners.

In sum, there is extensive support for the sentences imposed by the district court. The sentences imposed were within the applicable statutory sentencing ranges. The LS/CMI assessed Danon as a high risk to reoffend and a combined score on the VASOR-II and SOTIPS assessed him as a moderate to high risk to reoffend. The offenses for which Danon was convicted occurred over the course of many years, involved numerous victims, and as noted in the PSR, Danon perpetrated "the ongoing sexual abuse of minor children by supplying them with alcohol, drugs, [prescription] medication, and money." Further, the harm caused to the victims by Danon's commission of these heinous offenses is too great to be measured. The sentences imposed by the district court were not an abuse of discretion.

### 6. INEFFECTIVE ASSISTANCE OF COUNSEL

Danon's final assignment of error is that his trial counsel was ineffective for "fail[ing] to file any pretrial motions regarding the Cellebrite report or Google searches obtained from [his] phone." Brief for appellant at 11.

In *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020), the Nebraska Supreme Court stated:

> In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.
>
> When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Once raised, the appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims.
>
> In order to know whether the record is insufficient to address assertions on direct appeal that trial counsel was ineffective, appellate counsel must assign and argue deficiency with enough particularity (1) for an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) for a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court. When a claim of ineffective assistance of trial counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel.

Having reviewed the record in the instant case, we find that the record is insufficient for this court to address his claim of ineffective assistance on direct appeal. This claim is preserved for postconviction review.

## VI. CONCLUSION

Having rejected Danon's claims with the exception of his preserved postconviction claim, we affirm Danon's convictions and sentences.

AFFIRMED.